## COUNTY OF PROVIDENCE, MARCH TERM, 1862, AT PROVIDENCE.

PRESENT:

HON. SAMUEL AMES, CHIEF JUSTICE.
HON. GEORGE A. BRAYTON, ASSOCIATE JUSTICE.

---

## ATTORNEY GENERAL v. CITY OF PROVIDENCE.

The act entitled "An act securing the estates of persons dying, leaving real or personal estate within the State, and leaving no known heirs, or others entitled to distribution within the United States," found in the digest of 1798, p. 310, being chapter 160 of the Revised Statutes, vests the beneficial interest in estates escheated from the dying intestate and without heirs of the person last seized of the same, in the towns which take possession and charge of such estates, in conformity with the act; and when thus vested, such interest cannot be recalled by the General Assembly.

THIS was an information in equity, filed by the Attorney General, in behalf of the State, against the City of Providence, for an account of the rents, profits and value, of certain real estate, situated in Weybosset street, in said city, of which one Alexis Teste died seized, intestate, on the 18th day of October,

1818, leaving, as the information alleged, "no heir-at-law in this State, or in any of the United States, or in any foreign country or dominion, who could inherit the same," for which cause the State claimed said estate as an escheat. The information alleged, that the City, then Town, of Providence, on the 19th day of January, 1823, took possession of said real estate, and has since received the rents and profits of the same, and has appropriated a portion thereof to the use of a public street, and admitting that the city had recently, on the demand of the General Assembly, yielded the possession of what remained thereof, to the State, claimed an account of the rents and profits of said estate theretofore received, and of the value of the portion appropriated by the City to the use of a street.

To this information the City demurred, and the State joined in the demurrer.

*Clarke,* City Solicitor, *with whom was T. A. Jenckes, for the demurrer.*

I. The statute, in the Digest of 1798, p. 310, and in the Digest of 1822, p. 241, constitutes the towns the custodians of all estates situated similarly to that in the present suit, and vests in the towns where such an estate may lie, the whole beneficial interest in the income of the estate, as against everybody but the heir or legal representative of the deceased.

II. Although the State might have taken possession of the estate as an escheated estate, and collected the rents and profits and kept them in the State Treasury, yet, having granted them by a general statute to the towns for their use, the town receiving such funds has a right to retain them as against the State, and are acountable only to the heir or legal representative, when he shall appear. In case of escheated estates, the statute operates as a grant. See statutes of other States with regard to escheated estates. Vermont Revised Statutes, 1839, p. 292, § 3, to towns for schools. Florida Revised Statutes, 1847, p. 403–4, Tit. 6, Chap. 1, to be applied to public education, added to State fund for that purpose. Michigan Revised Statutes, 1846, Chap. 67, p. 279, to State school fund. Tennessee Revised Statutes, 1827, Chap. 64. Indiana Revised Statutes, 1843,

p. 438, § 125, to school fund. Mississippi Revised Statutes, 1840, Chap. 9, § 1, p. 120. North Carolina Revised Statutes, 1837, Vol. 2, p. 428.

III. This statute has never been repealed or modified, and is still in force, and constitutes a sufficient defence to this suit, notwithstanding the resolution passed by the General Assembly, at its January Session, 1859. See *Holden* v. *James*, 11 Mass. 396; 2 Washburn on Real Property, pp. 443, 444.

*Burges, Attorney General, with whom was R. W. Greene, against the demurrer.*

I. The real estate, described in the information, became by escheat the property of the State, immediately upon the death of Teste, intestate, in 1818, he having left, as the information states, no persons behind him capable of inheriting it. 3 Cruise Dig., p. 419, n.; 4 Kent's Com. 424; 7 N. H. Rep. 475; 1 Spencer R., 31; 1 New Jersey R., 582; 1 Texas R., 673; 15 Pick., 345; 1 Littel's R. 149.

II. The City of Providence having taken possession of the State's property, and received the rents and profits thereof, as the demurrer admits, may be regarded as the trustee of the State, and liable to the account asked for in the information.

III. The statute, under which the city defends, has no application to the case stated in the information, of an actual dying without heirs, and does not affect to deal with property so situated; but only with intestate property, to which there is no known heir within the limits of the United States; and then only as custodian of the same, for the benefit of the heir, when he may appear and claim.

IV. If, under the statute, the city takes possession of an estate, if there are heirs, it takes for their use; if none, for the use of the State; but in neither event has any beneficial interest of its own.

AMES, C. J. The statute, the construction of which is involved in the demurrer, in its first section enacts, that "when any person shall die, leaving any real or personal property within this State, and shall leave no known heir or legal representative within the United States to claim the same, it shall be lawful for

the town council of the town in which such real or personal estate may be, to direct the town treasurer of such town to take the same into his possession, for the use of the town, until the heir or other legal representative of such deceased person shall call for the same."

The principal purpose of the act, as appears from its terms, as well as from the preamble to the act of 1768, in which it had its origin, was to provide for the custody and care of the intestate property of deceased persons, derelict, from the absence of claimants within the Colony first, and since within the United States, to represent them; and through the intervention of the towns within whose limits such property might be, to preserve it from being wasted, or intruded on by strangers, to the disinherison of the heirs, or to the loss of the legal representatives, when they might come to demand it. Where property is thus left, it can rarely be known with certainty, that there are no heirs capable of inheriting it; and the fair presumption, in the larger number of cases is, that though they may not be known, they somewhere exist. It was with this state of things that the statute, as a practical measure, was designed to deal; and in our judgment, to answer its purpose, as well as to satisfy its words, its first section embraces all intestate property of deceased persons, derelict for want of lawful claimants, whether because none such exist, as in case of escheats and *bona vacantia*, or because, though known, they are without the limits of the United States.

Had the statute stopped with merely directing that the towns within whose limits such property might be, should, through their officers, take possession of, and improve it, for the benefit of the heirs or legal representatives when they might come, it might well be said, that they were but public administrators or escheators, as the case might turn out to be; and, in the one capacity, bound to account to the heirs and representatives of the deceased when they might appear, and to the State, as entitled to escheats and *bona vacantia*, if no heirs should exist. But the statute does not stop here. It provides, not merely that it shall be lawful for the town council to direct the town treasurer to take such property into his possession, but *"for the use*

*of such town,* UNTIL the heir or other legal representative of such deceased person shall call for the same;" Dig. 1798, p. 310, § 1. And again, in the 2d section of the same statute, (Ib. p. 311,) when treating of surplusses in the hands of executors or administrators, unclaimed for the period of two years, it provides that the same shall be paid into the town treasury of the town where letters testamentary or of administration were taken out, "*for the use of such town,* UNTIL the heirs or persons entitled to distribution thereof, shall appear to claim the same." These words, thus repeated, that they may apply not only to all intestate real property unclaimed, but to all unclaimed personal property left by a deceased person, whether testate or intestate, are not without signification and purpose. In our judgment they were designed to declare, as they do declare, the beneficial use of the property embraced within the provisions of the statute to be in the towns in which it is situated, or, in case of administration of personal property, in which letters testamentary or of administration are taken out, subject only to the rightful claim of heirs or legal representatives, if any such shall appear. The beneficial tenure of the town is, by this enactment, "*until* the heir or other legal representative of such deceased person shall call for the same," in compensation for the charge over such property imposed by the statute upon the town, in favor of those entitled, if any such shall call.

This construction is, we think, fortified by the relation which, as our early history informs us, was supposed to be borne by the towns to the Colony. Before the first charter procured by Roger Williams from the Earl of Warwick and the Lords' Commissioners, in 1644, there were four principal settlements, or towns : Providence, Newport, Portsmouth and Warwick, three of which only were embraced within the terms of the charter ; Warwick being admitted at the first General Assembly held under the charter, in 1647. Preceding the charter and the Colony incorporated by it, in existence, it was at least, quite natural, that the opinion should prevail, that the towns, as the first sources of power and title, were lords of the fee. Accordingly, in the Criminal Code enacted by the first General Assembly, in

1647, following the recital of the punishment of murder and petit treason by death and forfeiture of estate, as provided by the law of England, there is this declaration: "Only we do declare, touching this matter, that each town is, of good right, the lord of the fee in respect of all the lands contained within its bounds, from whom every man has received his lands; which lords being all here present, in this General Assembly, and conceiving the wives and children ought not to bear the iniquities of the husbands and parents, at least as the case stands with us, do therefore jointly agree, as far as in us lies, to allow the privilege of Kent throughout the whole Colony, and to propagate that country proverb in Providence Plantations: 'The father to the bough and the son to the plough,' he having first defrayed the charges about the delinquent." The towns in this State have ever played a principal part in the administration of its internal affairs, and for that purpose have been endowed with large and various powers and privileges. At this day, the people, as assembled in their respective towns, are alone represented in both branches of the General Assembly; and these municipalities, either directly or through their principal officers, have ever been its favorites as the depositary of power, and the recipients of benefits. If the question, as a general one, had arisen at any former period of our history, whether the towns or the State should have the benefit of escheats, no one penetrated with its spirit could doubt, that it would be answered, as it has been answered, at least, since 1768, by this statute, if not since 1647, by the declaration of the first General Assembly under the first charter, in favor of the former. So far as we can learn, this is the first claim of the sort made by the Colony or State against the towns; though such cases, as the statute of 1768 recites, had been, as they must have been, numerous. We will not unsettle a practical construction of so old a statute, which has so long obtained; but leave it, if its spirit has passed away, or its policy no longer prevails, to be changed for the future, as it may be, by the legislative will, expressed in the form of a new statute upon this subject, or an amendment of the old one. In conclusion, however, we may be permitted to say,

that the statute as it now exists, vesting estates derelict by heirs or legal representatives, in the towns, subject to the call of those entitled, leaves them precisely where they should be left in a country governed by law, as distinguished from one governed by mere will—in the charge of wealthy corporations suable by those entitled, instead of that of the State, which is not suable.

The information states, that Alexis Teste died seized of the real estate in question, and intestate, on the 18th day of October, 1818, and that on the 19th day of January, 1823, the City, then Town, of Providence, entered and took possession of said estate. At both those periods the act, substantially as it remains now, was in force, as may be seen by comparing it, as it stands in the Digest of 1798, and 1822, with the same enactment, now forming Chapter 160 of the Revised Statutes. As the estate vested beneficially in the town by force of the statute, subject only to the call of the heirs, and the information discloses no title in the State except by escheat, the demurrer to the information must be sustained. It is not pretended, that after the title has vested in the city under the law, the State can recall it, any more than an individual can recall a title once vested under his deed.

The information has been filed by the Attorney General, in conformity with a resolution of the General Assembly, passed, as we must believe, from a sense of public duty, and in the assertion of what was deemed to be a public right; and for that reason, as well as in conformity with the general rule, must be dismissed without costs.